**NINTENDO OF AMERICA INC., Plaintiff,**

v.

**The MAGNAVOX COMPANY and Sanders Associates, Inc., Defendants.**

**No. 86 CIV. 1606 (LBS).**

United States District Court, S.D. New York.

March 2, 1989.

See also 659 F.Supp 894.

Mudge Rose Guthrie Alexander & Ferson, (John J. Kirby, Jr., Robert J. Gunther, Jr., Thomas G. Gallatin, Jr., of counsel) and Morgan & Finnegan, (Alfred P. Ewert, of counsel), New York City, for plaintiff.

Neuman, Williams, Anderson & Olson, (Theodore W. Anderson, James T. Williams, of counsel), Chicago, Ill. and Fitzpatrick, Cella, Harper & Scinto (Joseph A. Fitzpatrick, of counsel), New York City, for defendants.

## OPINION

SAND, District Judge.

This is a declaratory judgment action brought by plaintiff Nintendo of America Inc. ("Nintendo") seeking, inter alia, a declaration of invalidity and non-infringement of U.S. Patent No. Re 28,507 ("the '507 patent") and U.S. Patent No. Re 32,305 ("the '305 patent"). Both patents are owned by defendant Sanders Associates, Inc. ("Sanders"), which granted an exclusive license with a right to sublicense to defendant Magnavox Company ("Magnavox").[1] In its counterclaims, Magnavox al-

---

1. For the sake of simplicity, this opinion will refer to the defendants collectively as Magnavox.

leges that several of the video games manufactured by Nintendo infringe its patents.

The action was bifurcated for purposes of trial, with the Court having held a hearing on the threshold issue of whether the '507 and '305 patents are unenforceable because of alleged inequitable conduct by Magnavox during the patent application process.

The inequitable conduct claimed by Nintendo relating to the '507 patent, which was issued by the Patent and Trademark Office ("PTO") on August 5, 1975, includes the following allegations:

¶ the deliberate failure to disclose to the Patent Examiner known relevant prior art, including the computer/video game Space War;

¶ the applicants' failure to investigate their knowledge of the Space War game;

¶ an improper off-the-record meeting with the Patent Examiner prior to filing the '507 patent application;

¶ and the deliberate failure to inform the Patent Examiner that U.S. Patent No. 3,728,480 had issued and the submission of misleading information to cover up that fact. Plaintiff's Contentions (Pre–Trial Order ¶ 3(b)) at ¶¶ 1–2.

The inequitable conduct claimed by Nintendo relating to U.S. Patent No. 3,829,095, which issued on August 13, 1974, and its corresponding '305 reissue patent, which issued on December 16, 1986, includes the following allegations:

¶ the failure to disclose Space War in connection with the '095 patent application despite its materiality;

¶ the concealment of the Glaser patent, U.S. Patent No. 3,151,248, despite its materiality to the light gun claims;

¶ the concealment of the fact that, during the prosecution of the reissue of the '095 patent, the German Patent Office rejected a corresponding German patent application based, in part, on the Glaser patent. *Id.* at ¶ 3.

Nintendo also alleges that Magnavox's conduct with respect to a number of other patents—particularly U.S. Patent No. 4,395,045, which previously in this litigation Magnavox alleged to be infringed by Nintendo—is further evidence of Magnavox's inequitable conduct with respect to its video game patents. *Id.* at ¶ 4.

Magnavox denies all allegations of wrongdoing in the prosecution of the patents and claims that the patent examiner had before him all material prior art references. Defendants' Contentions at ¶¶ 1–9.

This action calls upon us to revisit the early days of the video game industry, when a simple ping-pong game captured the imagination of America. Children nowadays—weaned on sophisticated video games that replicate laser wars and magical kingdoms and boxing matches—would scoff at the idea of playing such a primitive game. But without the pioneering work that is at issue in this litigation, television sets today would do no more than receive broadcast signals.

In brief, this action presents the issue of whether the patents received on those first video games were procured by inequitable conduct. The principal Nintendo claim is that one of Magnavox's patent attorneys had seen an experimental computer/video game called Space War while an undergraduate at Stanford University in the early 1960s and intentionally hid the existence of that game from the PTO during the prosecution of the '507 and '095 patent applications (SN '256 and SN '691 respectively) in the mid–1970s.

## THE APPLICABLE LAW

Inequitable conduct vitiates a patent when a patent applicant fails to disclose material information, or submits false material information, with an intent to deceive the PTO. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988). The party challenging the patent must prove the elements of materiality and intent by clear and convincing evidence. *Id.* Nintendo and Magnavox agree that the test stated in *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411 (Fed.Cir. 1987), is controlling:

One who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of:

(1) prior art or information that is material;

(2) knowledge chargeable to applicant [or applicant's attorneys] of that prior art or information and of its materiality; and

(3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.

That proof may be rebutted by a showing that:

(a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO);

(b) if the prior art or information was material, a showing that applicant did not know of that art or information;

(c) if applicant did know of that art or information, a showing that applicant did not know of its materiality;

(d) a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO.

835 F.2d at 1415 (footnote omitted and paragraphing added). In other words, inequitable conduct is not established upon a mere showing that art or information having some degree of materiality was not disclosed. To be guilty of inequitable conduct one must have intended to act inequitably. *Id.*

The requirement that a patent applicant disclose material information primarily refers to information that would be covered under the standard applied by the PTO, which is codified at 37 C.F.R. § 1.56(a): "[I]nformation is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1363 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (calling the PTO standard "an appropriate starting point for any discussion of materi-

ality"). Although Rule 56(a) was not enacted until 1977, which is subsequent to the relevant period of this litigation, the rule was merely a codification of the PTO's longstanding policy on fraud and inequitable conduct and of the existing case law. *Driscoll v. Cebalo*, 731 F.2d 878, 884–85 (Fed.Cir.1984); *see also Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1152 (Fed.Cir.1983) (applying the § 1.56(a) standard to conduct that occurred from 1968 to 1971).

■ An applicant cannot avoid the requirement that he disclose material prior art by ignoring clear indications that such prior art exists. The Federal Circuit has stated:

As a general rule, there is no duty to conduct a prior art search, and thus there is no duty to disclose art of which an applicant could have been aware. However, one should not be able to cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art. When one does that, the "should have known" factor becomes operative.

*FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 526 n. 6 (Fed.Cir.1987) (citations omitted). It is self-evident that the effective functioning of the patent system requires that all reasonable doubts about the materiality of a prior art reference be resolved in favor of disclosure. *See* Manual of Patent Examining Procedures ("MPEP") § 904.02 ("if doubt exists as to the inclusion of a reference, it is better to err in citing too much art rather than too little").[2] This duty of disclosure continues until the patent actually issues.

Since the parties briefed the issue, the Federal Circuit, sitting en banc, clarified the intent requirement for a showing of inequitable conduct:

We adopt the view that a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the

---

**2.** All citations to the MPEP refer to the editions that were current at the relevant times.

evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.

*Kingsdown Medical Consultants, Ltd.,* 863 F.2d at 876 (en banc in part). Previous opinions of the Federal Circuit have held that inferences of intent may be drawn from considerations touching on materiality and an applicant's knowledge thereof.

No single factor or combination of factors can be said always to *require* an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead.

*FMC Corp. v. Manitowoc Co.,* 835 F.2d at 1416. Thus, the presence or absence of inequitable conduct is determined by balancing overlapping considerations of materiality, knowledge and intent. *Id.*

## DISCUSSION

In the Pre–Trial Order the parties stipulated to many of the relevant facts surrounding this dispute, which stipulation is adopted and set forth as Appendix 1 hereto ("Stipulated Facts"). Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following supplemental findings of fact and conclusions of law.

### I. Allegations Concerning the '507 Patent

The '507 reissue patent describes an apparatus and method for playing games on the screen of television receivers. As explained in the Background of the Invention, a major purpose of the '507 reissue patent and the '284 original patent was to make video games accessible to people in their homes: "Since most homes are equipped with television receivers, the only expense required to provide added family enjoyment is the expense of a control unit of one type or another." Prior to the invention, video games required hookups to large computers.

Although a wide variety of games are described in the '507 patent (including bowling and baseball), the focus of the invention was on "ball and paddle"-type games like ping-pong and hockey. In ball and paddle games an object such as a ping-pong ball or a hockey puck (described in the patent as "hit spot") shuttles back and forth between objects representing ping-pong paddles or hockey sticks (described in the patent as "hitting spots"). Upon coincidence between the hit spot and a hitting spot, the hit spot changes direction. If there is no coincidence between a hit spot and a hitting spot, the hit spot either disappears off the edge of the screen (representing, for example, the end of the table in the ping-pong game or the goal in the hockey game) or rebounds off of a wall (representing, for example, the boards in the hockey game).

### A. Failure to Disclose or Investigate Space War

The parties agree that the '284 patent was reissued as the '507 patent on August 5, 1975, without Space War ever having been brought to the attention of the PTO. Stipulated Facts at ¶ 44. Nintendo alleges that Space War would have been material to the PTO's consideration of claims 25, 45, 51 and 60 of the '507 patent and that Magnavox intended to deceive the PTO by failing to disclose the game. The relevant claims of the '507 patent state:

25. In combination with a standard television receiver, apparatus for generating symbols upon the screen of the receiver to be manipulated by at least one participant, comprising:

means for generating a hitting symbol, and

means for generating a hit symbol including means for ascertaining coincidence between said hitting symbol and said hit symbol and means for imparting a distinct motion to said hit symbol upon coincidence.

. . . .

45. Apparatus for playing a hockey type game upon the screen of a cathode ray tube, comprising:

means for displaying a first hitting spot;

means for displaying a second hitting spot;

means for displaying a hit spot;

means for controlling the position of said first and second hitting spots;

means for controlling the position of said hit spot including means for ascertaining coincidence between either of said hitting spots and said hit spot and means for imparting a distinct motion to said hit spot upon coincidence.

. . . .

51. Apparatus for generating symbols upon the screen of a television receiver to be manipulated by at least one participant, comprising:

means for generating a hitting symbol; and

means for generating a hit symbol including means for ascertaining coincidence between said hitting symbol and said hit symbol and means for imparting a distinct motion to said hit symbol upon coincidence.

. . . .

60. Apparatus for playing games by displaying and manipulating symbols on the screen of a cathode ray tube comprising:

means for generating vertical and horizontal synchronization signals;

means responsive to said synchronization signals for deflecting the beam of said cathode ray tube to generate a raster on said screen;

means coupled to said synchronization signal generating means and said cathode ray tube for generating a first symbol on said screen at a position which is directly controlled by a player;

means coupled to said synchronization signal generating means and said cathode ray tube for generating a second symbol on said screen which is movable;

means coupled to said first symbol generating means and said second symbol generating means for determining a first coincidence between said first symbol and said second symbol; and

means coupled to said coincidence determining means and said second symbol generating means for imparting a distinct motion to said second symbol in response to said coincidence.

In order to find inequitable conduct in the failure to disclose or investigate Space War during the prosecution of the '507 patent, it is necessary to find by clear and convincing evidence that Space War was material to any of the four cited claims of the '507 patent; that the applicant knew of Space War and its materiality; and that the applicant's failure to disclose Space War resulted from an intent to mislead the PTO. *See FMC Corp. v. Manitowoc Co., supra.*

For a brief history of the development of Space War and a description of the game, see Stipulated Facts at ¶¶ 14–20. We mention here only that the game was developed in 1961–62 at the Massachusetts Institute of Technology for play on a PDP-1 computer manufactured by Digital Equipment Company ("DEC"). A copy of the game was brought to Stanford University in 1963, where it was played on a PDP-1 in Stanford's computer center. While an undergraduate at Stanford in the spring of 1963, James T. Williams observed the game being played. As of 1974, Williams was a member of the Chicago law firm of Neuman, Williams, Anderson & Olson, which was retained as outside patent counsel to Magnavox early that year. At the heart of Nintendo's inequitable conduct claim are contentions relating to Williams' recollection of that game and his failure to disclose it at the time the SN '256 reissue application was being considered by the PTO in 1974–75.

*Materiality:* Nintendo contends that Space War is material to the four claims of the '507 patent because both the game and the patent

involv[ed] the operation of symbols on the screen of a cathode ray tube one of which was controllable by a player and another of which was controlled by the game electronics, the detection of coincidence between these two symbols and the imparting of a "distinct motion" to one of the symbols upon coincidence.

Plaintiff's Post–Trial Brief at 10. Magnavox argues that their knowledge of Space War was incomplete and, in any event, that Space War is not material to the claims of the '507 patent. In addition, Magnavox argues that Space War is less material than other prior art that had been disclosed, in particular the '480 patent. Although the Court finds that Space War would have been material to the claims of the '507 patent, we discuss the issue briefly because we also find that Nintendo has failed to establish that the applicant either knew of that materiality at the time of the reissue application or intended to deceive the PTO.

The Court's finding of the materiality of Space War is based primarily on the close study of the language of the patent and the viewing of a videotape of Space War made last year during a demonstration of the game on a PDP–1 computer at the Computer Museum in Boston.

A mere recitation of the important elements of the claims of the '507 patent illustrates the reasons for our finding of materiality. The elements of hit and hitting symbols are represented in Space War by the spaceship and torpedoes respectively. The object for one player is to aim his spaceship so as to achieve coincidence between the torpedo he fires and the other spaceship. The other player tries to avoid coincidence between the torpedo, the position of which is controlled by the computer, and his own spaceship, which moves under his own control. The element of "imparting a distinct motion" is represented in Space War by the explosion displayed when a torpedo strikes a spaceship. In that explosion, as observed on the videotape, the spaceship and torpedo disintegrate into an expanding ball of tiny dots of light, representing pieces of debris, which then disappears. As in the traditional ball and paddle games, a distinct motion is imparted to the hit object, to wit, the explosion that is imparted to the spaceship.

The arguments Magnavox makes to avoid the logical similarity between the '507 patent and Space War restrict "imparting a distinct motion" to ball and paddle games where a hit object (e.g. a ping-pong ball) retains its form and moves in a different direction once it achieves coincidence with a hitting object (e.g. a ping-pong paddle). In support of its limited interpretation of the phrase, Magnavox relies on a narrow reading of the patent specifications. But there is no such limitation in the language of the claims, and we see no reason to read one into the patent. Instead, we believe that the claim language "imparting a distinct motion" should be given its traditional English language meaning, which clearly encompasses the explosion in Space War.[3]

At the time of the patent application, the patent examiner would have considered the broadest reasonable interpretation of the actual claim language (which forms the basis of the invention that is being granted protection) and not the applicant's subjective interpretation of the claim language. It is well-established patent law that language from the specification is not to be used to limit the scope of the claims during the prosecution of a patent application. This is addressed by MPEP § 904.01, which provided:

> The breadth of the claims in the application should always be carefully noted; that is, the examiner should be fully aware of what the claims do *not* call for, as well as what they do require. There is always the danger of reading into the

**3.** Impart: "1. To grant a share of; bestow. 2. To make known; disclose." The American Heritage Dictionary of the English Language 659 (1976).

Distinct: "1. Not identical; individual; discrete. 2. Not similar; different; unlike. 3. Easily perceived by the senses or intellect; clear. 4. Well-defined; explicit; unquestionable." *Id.* at 383.

Motion: "1. The action or process of change of position. 2. A meaningful or expressive change in the position of the body or a part of the body; a gesture or movement...." *Id.* at 856.

In that the computer-generated explosion following coincidence between a spaceship and a torpedo represents an explicit change in the position of the spaceship, we have no doubt that the explosion falls within the literal meaning of the term "imparting a distinct motion."

claim limitations imported from the specification or drawing.

See also In re Queener, 796 F.2d 461, 464 (Fed.Cir.1986) (Newman, J., concurring) ("It is now beyond debate that limitations from the specification will not, during examination before the PTO, be imputed to claims in order to avoid prior art; such limitations must be specifically stated in the claims."); In re Lundberg, 44 C.C.P.A. 909, 244 F.2d 543, 548 (1957) ("Limitations in the specification not included in the claim may not be relied upon to impart patentability to an otherwise unpatentable claim."). But Magnavox's interpretation would have us do just that.

■ Even if we look beyond the claims, we find that Magnavox's limited reading of the claim language is unsupported by the specification. Among the many examples of games cited in the specifications is bowling, where the motion imparted ("If pin (pins) are hit, they disappear") is more like the explosion in Space War than the ball and paddle action of ping-pong and hockey. Thus, although a patent applicant can be his own lexicographer, we do not find that the language in the SN '256 reissue application should be given anything other than its everyday meaning.

Magnavox also claims that Space War was not material because the cited prior art included more material references, including the '480 patent. In the first place, we reject the explanation about the '480 patent because, as explained below, the applicants never directly cited that patent to the PTO as prior art. More importantly, we reject it because Williams testified that he cannot recall whether he considered the '480 patent to be a sufficient reason for not citing Space War. Magnavox cannot now claim that the '480 patent was more material than Space War when that apparently had nothing to do with its decision not to cite it at the time of the application. To allow such a post hoc justification would defeat the purpose of an inequitable conduct claim, which focuses on an applicant's conduct before the PTO.

As to the other prior art cited by Magnavox, we believe that Space War still would have been relevant to the claims of the SN '256 reissue application. For instance, unlike Goldsmith (U.S. Patent No. 2,455,-992), Space War disclosed multiple symbols and coincidence between symbols. In combination with prior art such as Althouse (U.S. Patent No. 2,847,661), it could have been used to disclose the playing of the game on a raster scan. Thus, Space War either best embodied a combination of elements represented in the cited prior art or could have been used in combination with other cited art; either way, it would have been material to the PTO's consideration of the claims of SN '256.

We also reject the other explanations offered by Magnavox, including the fact that Space War was played on a point plot display and the '507 patent specified a raster scan. The technology at the time allowed an inventor to go back and forth between the two types of displays, and Williams acknowledged at trial that the absence of a raster scan was not a sufficient basis for not disclosing Space War to the PTO. Space War, after all, could have been disclosed in combination with other prior art references that taught raster scans. In addition, claim 45 of the '507 patent specifies "on the screen of a cathode ray tube" and does not require a raster scan.

Thus, we find that the Space War that existed in 1963 would have been material to the PTO's consideration of the SN '256 reissue application.

■ *Knowledge of Materiality:* The fact that Space War was material to the claims of the '507 patent does not end our inquiry. There must also be clear and convincing evidence that Williams or others involved in the prosecution of the SN '256 patent application had knowledge of that materiality and that he withheld it in an attempt to deceive the PTO. The knowledge element is critical in this action, for much of Nintendo's claim is based on Williams' eleven-year-old memory of a computer game he briefly saw on one occasion at Stanford's computer center.

There are several phases during which the applicants' knowledge can be measured. From the beginning of Williams'

involvement with the reissue application in early 1974 until July 1975, the only information that was known about Space War was that which Williams recalled based on his having seen the game played at Stanford in 1963. Williams' recollection at that time was, understandably, very sketchy.

Q.: [W]ill you tell us what you recall having seen at Stanford.

A.: What I recall was a PDP–1 computer with a point [plotter] display on it and there was a game which involved two players, each player could manipulate a space ship on the face of the cathode ray tube.

I believe that there were four switches. One switch—each player had four switches, one to cause his spaceship to rotate counterclockwise; one to cause it to rotate clockwise; one to cause thrust to be applied to the ship in the direction in which it was pointed and one to fire missiles or torpedoes at—in the direction in which the spaceship was pointed.

. . . .

Q.: ... [W]as your recollection distinct enough to know that you did not know about certain elements of the game?

. . . .

A.: There were things that I didn't recall, that's right.

. . . .

Q.: [D]id you ... recall what happened when a torpedo hit a spaceship?

. . . .

A.: No, sir, I didn't.

Transcript at 240–41, 250–52.

Williams further testified that he had a five-minute conversation with Anderson about the relevance of Space War after the filing of the '284 and '285 reissue applications (SN '256 and SN '023 respectively).

Q.: [I]s it fair to say that you and Mr. Anderson considered together whether you should cite your recollection to the Patent Office?

A.: I think it was fair that—to say that we considered whether we should do anything about it at all, whether it was a matter of concern to us. And I think we decided that it was not a matter of concern and inherent in that was it didn't have to be cited.

Q.: .... You mean a matter of concern in complying with your duty of candor to the Patent Office, is that what you're referring to?

A.: Yes.

. . . .

A.: In my view, that recollection could not have had anything—any real bearing on that application.

. . . .

. . . .

A.: The kinds of games we were talking about at that time were, as I said, these games where you could have a hit symbol and a hitting symbol. You maneuver the hitting symbol to cause coincidence with the hit symbol and then the hit symbol bounces off, like the ping-pong game that was talked about this morning.

And those are the kind of symbols that we had in mind and those are the kinds of symbols we were thinking about and we certainly had no reason to think that ... this game that I recalled had any kinds of symbols like that.

. . . .

We certainly had no reason to think that once the spaceship and the torpedo came into contact with each other that there was any distinct change in motion of the torpedo.

Transcript at 247–48, 256, 262–64. Based on this analysis, Williams and Anderson made a deliberate decision not to disclose Space War to the PTO.

We find Williams' explanation credible. There is no doubt that his memory some eleven years after seeing Space War at Stanford was incomplete. His recollection of the game showed that he lacked specific knowledge of many elements that would correspond to the patent claims, including the specific representations of hit and hitting symbols and of imparting a distinct motion on coincidence. He also knew the game was not played on a raster scan.

Although Nintendo tries to cast doubt on the extent of Williams' recollection, we find no reason to believe that after eleven years he would have remembered more specific information, such as the response of a spaceship after it was hit by a torpedo. In addition, we note in passing that we accept Williams' statement that he is unable to separate out exactly what information he knew of in 1974–75 and what information he picked up over the past fourteen years of litigation involving the patents.

Accepting Williams' testimony about the extent of his recollection, we find that it was insufficient to warrant disclosure to the PTO both because he failed to appreciate the association between the elements of Space War and the '507 patent and because his recollection was missing certain key elements. In particular, we find Williams' claim that he did not know of the materiality of Space War to be convincing because of the conceptual difficulty of reading the hit and hitting symbols of the patent onto Space War.

The issue is so complex that even Nintendo suffered from confusion over the elements throughout the history of this litigation. An affidavit by an expert filed by Nintendo in March 1986 referred to a spaceship as a hit symbol and a torpedo as a hitting symbol. A memorandum filed by Nintendo in January 1987 reversed the elements, referring to a spaceship as a hitting symbol and a torpedo as a hit symbol. At trial, Nintendo went back to its original position that a spaceship is a hit symbol and a torpedo is a hitting symbol, and we agreed with that analysis. But Nintendo's confusion on this matter underscores the validity of Williams' claim that he was unaware of the materiality of Space War.

At the time the applicants sought reissue, their attention was focused on other aspects of the SN '256 patent application, such as the specific types of display used in playing the games. That, after all, was the purpose of seeking reissue in the first place. Magnavox sought to expand the scope of the '284 patent to insure that it covered video arcade games. Williams testified:

A.: The reason [for the reissue applications] was that in ... licensing discussions with Mr. Briody [Magnavox's corporate patent counsel], a number of the television game manufacturers had taken the position that the claims were not infringed because those coin operated games used television monitors or television receivers with the portions which enabled them to receive broadcast signals disabled.

We had reviewed the 284 and the 285 patent and thought that the claim should not be that narrowly construed and that they did cover such devices, but in order to make it clear, we thought we would go to the Patent Office and present new claims which would eliminate that type of argument.

. . . .

Q.: Is it fair to say, sir, that the focus of the reissue application was on the display of the games?

A.: The focus was on whether a television monitor was used or a television receiver was used.

. . . .

Q.: So the focus of the reissue was on displays?

A.: Yes, the reason it was filed was because of this television monitor/television receiver distinction.

Transcript at 191–93. We accept this explanation and believe it further supports Williams' contention that he did not think of Space War as being material to the patent application.

We also believe that the applicants were focusing at the time on ball and paddle games such as ping-pong and hockey. It is those games that received the most attention with the public and, understandably, would have been of greatest concern to the applicants. Although, as explained above, the patent covers much more than ball and paddle games, we accept Magnavox's explanation that that was their focus during the prosecution of the patent application.

Nothing was added to Williams' knowledge about Space War until July 15, 1975, some three weeks before the '507 patent issued on August 5, 1975 and nearly three

months after the Notice of Allowance was issued on April 24, 1975. During a deposition taken in Palo Alto, California, in connection with Magnavox's patent infringement actions against other manufacturers, the book *II Cybernetic Frontiers* was brought to the attention of Williams, Anderson and Briody. *See* Stipulated Facts at ¶¶ 38–40. Although the book was copyrighted in 1974 and thus was not prior art itself, it contained a description of the game Space War as it existed in 1972 that may have been used as evidence of a prior use or prior knowledge.

■ The description of Space War in the book was vague and conveyed only basic information:

Rudimentary Spacewar consists of two humans, two sets of control buttons or joysticks, one TV-like display and one computer. Two spaceships are displayed in motion on the screen, controllable for thrust, yaw, pitch and the firing of torpedoes. Whenever a spaceship and torpedo meet, they disappear in an attractive explosion. That's the original version invented in 1962 at MIT by Steve Russell.

*II Cybernetic Frontiers* 40 (1974). The book's most significant disclosure was the fact that upon coincidence the spaceship and torpedo "disappear in an attractive explosion." We find, however, that this was so nondescriptive that it did not provide the applicants with sufficient additional information about Space War so as to require its disclosure to the PTO.

Nintendo also faults Magnavox's attorneys for not pursuing an investigation of Space War while they were on the campus of Stanford University. Although the attorneys might have been able to learn relevant information about Space War while they were at Stanford, the information they discovered in *II Cybernetic Frontiers* did not create any duty to investigate. Nintendo's claim is also unfair in that the attorneys were preoccupied during their trip to Stanford with their pending infringement actions. Consequently, Nintendo cannot point to information that Magnavox might have discovered at Stanford and use that as evidence of Magnavox's inequitable conduct.

On July 23, 1975, Magnavox was informed by Midway Manufacturing Company, a defendant in its pending patent infringement action, that Midway would rely on Space War as prior art to invalidate the '284 and '285 patents. Midway's interrogatory response informing Magnavox of that fact read as follows:

The development, construction and operation of the video game of Spacewar by various persons, not yet identified, at the Massachusetts Institute of Technology in 1961 and 1962, and the wide knowledge and use by others at other places, of Spacewar and other video games yet to be determined.

. . . .

Defendants Midway has not yet determined the exact dates of the acts referred to [above], but they are believed to have occurred between 1961 and May 27, 1969, the filing date of Patent No. 3,659,284.

Magnavox learned no additional information about the materiality of Space War from this vague interrogatory response.

On August 1, 1975, four days before the '507 patent issued, Williams inspected documents produced by Midway, including a copy of *II Cybernetic Frontiers*, a Rolling Stone magazine article about the game that was similar in content to the book and an undated DEC brochure describing the PDP–1 computer and the game Space War. Stipulated Facts at ¶ 42. These disclosures also added nothing new to Magnavox's knowledge to make it aware of the materiality of the game. Although Nintendo properly argues that Magnavox could have disclosed Space War to the PTO at that late date, we repeat that Magnavox's failure to do so was the result of its good faith belief that the game was not material and not the result of an intent to deceive the PTO.

■ As further evidence of Williams' knowledge of the materiality of Space War, Nintendo points to a file he created in 1975 while investigating the claims raised by defendants in Magnavox's infringement actions that Space War was invalidating prior

art. Williams created a file on which he affixed the label "Space War—Prior Art" and kept in it various materials such as the *II Cybernetic Frontiers* book. Nintendo argues that the wording on the label indicates that Williams considered Space War to be material prior art. Nintendo further argues that Magnavox's representations that the file was titled simply "Space War" (eliminating the modifier "prior art"), made in this action in Magnavox's local rule 3(g) statement in support of its cross-motion for summary judgment and in its pretrial proposed findings of fact, is indicative of a pattern of bad faith conduct by Magnavox.

 We do not consider the creation of the file label an event of such significance that it reflects Williams' determination that the game was actually prior art. Rather, we find entirely credible Williams' explanation that the file was created by someone in his office simply for the purpose of organizing the vast quantities of material that came in during Magnavox's patent litigation. In other words, we believe the label "Space War—Prior Art" did not represent Williams' legal conclusion about the game; it merely reflected the contentions of defendants in the patent infringement litigation. As for Magnavox's representations before this Court that the file was titled simply "Space War," we find that this error, while regrettable, does not have a bearing on Nintendo's claims of inequitable conduct in the prosecution of the '507 reissue patent in 1974–75.

 Nintendo also alleges that employees of Sanders knew of the materiality of Space War and withheld it from the PTO. The evidence shows that John Sauter brought a copy of Space War with him from Stanford when he started working at Sanders in 1969. However, Sauter's familiarity with the game is not relevant to our inquiry; Nintendo must prove inequitable conduct by someone involved in the patent application process. Nintendo's claims about Louis Etlinger, the head of Sanders' patent department, also fail. Etlinger was not involved in the patent applications at issue here and had no knowledge of the existence of Space War at Sanders until

September 1975, which was over a month after the '507 patent had issued. *See* Stipulated Facts at ¶ 46. Nintendo has failed to produce evidence that any of the relevant Sanders employees had information about Space War at the time that they were required to disclose to the PTO.

 The Court is aware of the difficulties Nintendo faces in proving Magnavox's intentional failure to disclose a material fact some fifteen years after the patent application was filed and twenty-six years after Williams actually saw the Space War game. However, Nintendo has failed to meet its burden. Although Nintendo argues persuasively that the undisclosed information known to Magnavox was material, there has been an insufficient showing of the applicants' knowledge of that materiality. Patent applicants have a duty of reasonable inquiry and cannot cultivate ignorance. We do not believe Magnavox's conduct violated that precept.

*Intent to Deceive:* We have found that the applicants did not have sufficient information about the materiality of Space War to require its disclosure to the PTO or to create a duty to investigate. Accordingly, we believe that the nondisclosure of Space War was made in good faith and not with an intent to deceive the PTO.

In conclusion, we find that there was not inequitable conduct during the prosecution of the '507 reissue patent in the applicants' failure to disclose or investigate Space War.

### B. Meeting with Examiner

 On April 15, 1974, Magnavox filed suit against video arcade game manufacturers alleging infringement of the '284 and '285 patents. Stipulated Facts at ¶ 21. As noted above, Magnavox at that time sought to broaden the scope of its claims to insure that they covered non-television receiver displays such as video arcade games played on monitors. On April 23, 1974, Williams and Seligman conducted an off-the-record interview with Patent Examiner Trafton to discuss the filing of reissue applications for the '284 and '285 patents.

Time was of the essence, for Magnavox's right to file for reissue was to expire two days later (two years after the issuance of the patents). Stipulated Facts at ¶ 22. Given the time pressure, Williams and Seligman sought the Examiner's reaction to the filing of the reissue applications.

The MPEP provides that an interview prior to filing is improper unless it is for the limited purpose of indicating the field of search to an attorney. *See* MPEP § 713.02 ("Prior to filing, no interview is permitted. However, in the examiner's discretion, a limited amount of time may be spent in indicating the field of search to an attorney, searcher or inventor."). Because Williams and Seligman already knew the relevant field of search for the patent applications, it is clear that the scope of the interview went beyond that. A letter from Etlinger to Briody dated April 23, 1974 confirms this, as does Williams' trial testimony.

Although the Examiner did not actually look at the application, it was described to him in sufficient detail that he was able to offer his opinion that he would be "favorably inclined" toward the refiling and that the claims, as stated in the existing patents, already cover the video arcade games against which Magnavox sought to protect itself. Furthermore, although Etlinger brought signed copies of the reissue applications with him to the meeting with the Examiner, they were not filed until two days later. In the interim, Williams broadened one claim and added another to the '285 patent reissue application. We find that there is only one rational explanation for this: the meeting with the Examiner went beyond a discussion of the field of search and provided Williams with sufficient information to make those amendments.

Nintendo's claim that this pre-filing meeting was improper is further supported by the applicants' failure to make a record of the meeting. The rules require that an applicant make of record in an application a "complete written statement as to the substance of any face-to-face ... interview with regard to an application ..." MPEP § 713.04. Insofar as the reissue application was the subject of the meeting, the lack of any such notice in the reissue application file was improper.

Magnavox's attempts to justify its actions are unavailing. Neither the fact that the patent application later submitted to the PTO contained the substance of the material discussed in the interview nor the fact that the Examiner himself might have violated his own obligation to file a report about the meeting once it became clear the applicants had not done so, relieved applicants of the obligation to file the statement.

The prefiling meeting thus violated three separate provisions of the MPEP: § 713.02 (interviews prior to first official action not permitted unless for limited purpose of discovering field of search); § 713.03 (interview for "sounding out" Examiner not permitted); and § 713.04 (substance of interview must be made of record). Nevertheless, we believe these violations in and of themselves do not amount to inequitable conduct sufficient to render the patent invalid. There was no intent to deceive the PTO, just a flouting of the procedural requirements.

### C. Failure to Inform Examiner That the '480 Patent Had Issued

█ Defendants have acknowledged that they made no reference to the '480 patent in the SN '256 reissue application. In the application filed April 25, 1974, Magnavox referred to the '480 patent by the patent application's serial number in spite of the fact that the '480 patent had issued on April 17, 1973. *See* Stipulated Facts at ¶¶ 23 and 34.

The consequence of this action is clear. An Examiner cannot rely on a pending application as prior art. *See* MPEP § 901.03 ("pending U.S. applications are preserved in secrecy ... and are not available as references"). Not only was the mistake made in the initial application, but it was compounded by a later action. When the applicants filed Amendment A to the SN '256 application on February 13, 1975, they deleted the outdated reference

to the SN '798 application and, instead of replacing it with the number of the '480 patent that had issued nearly two years earlier, replaced it with SN '966, the serial number of the continuation application to SN '798 that was filed in 1971. The updating of the application's serial number created the appearance that the '480 patent had not issued and was therefore not to be considered as prior art under 35 U.S.C. § 102(e).

Magnavox claims that the failure to inform the PTO of the issuance of the '480 patent was inadvertant and that the change to the SN '966 continuation application number was made to conform the SN '256 reissue application to the original patent as amended by a Certificate of Correction. Magnavox also claims that the patent examiner was not deceived by the omission of the '480 patent number in that he would have been aware that the application was granted once he did research into the original '284 patent application (SN '154) during the prosecution of the reissue application.

We accept the first explanation and reject the second. The updating of the application's serial number was a ministerial-type act that was performed without any intent to mislead the PTO. The applicant simply changed the serial number to conform the application to the amended original patent. While the applicant should have updated the serial number with the number of the issued patent, we believe this was an inadvertent mistake rather than an indication of an attempt to deceive the PTO.

As for Magnavox's second explanation, the focus in an inequitable conduct claim is on the actions of the patent applicant and not on the knowledge that might have been independently obtained by the PTO. The fact that the PTO had the means the discover that the '480 patent had issued does not absolve the applicants of their duty. *See, e.g., J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1564 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985) ("where inequitable conduct is at issue, mere possibilities [that the patent examiner knew of a nondisclosed reference] are insufficient").

We find, however, that because the applicants knew that a competent patent examiner would have discovered the '480 patent in the course of a search of the prior art, their actions are more appropriately classified as negligent and not as illustrative of an intent to deceive the PTO. Accordingly, we find that there was no inequitable conduct in the failure to inform the PTO that the '480 patent had issued.

## II. Allegations Concerning the '305 Patent

### A. Failure to Disclose Space War During '095 Prosecution

The '095 patent issued on August 13, 1974 without Space War ever having been brought to the attention of the PTO. Stipulated Facts at ¶ 24. Because Williams had no role in the prosecution of the SN '691 patent application, Nintendo has to prove that Etlinger, who was responsible for the prosecution of the application, withheld material information with an intent to mislead the PTO. *See FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d at 525 n. 5 ("One attempting to prove inequitable conduct must prove by clear and convincing evidence that the conduct of the person *charged* was inequitable.").

Nintendo admits that Etlinger's only source of knowledge about Space War was a discussion he had with Williams during an early 1974 meeting about the reissue applications for the '284 and '285 patents. Because we have found that Williams' recollection was so incomplete that he had no obligation to disclose Space War, it follows that no such obligation could flow to Etlinger. Although in retrospect it is clear that Space War was material to the claims of the '095 patent—the patent examiner in charge of the reissue application eventually rejected several claims based on the DECUS Space War brochure in combination with several other references—Nintendo has not proven that Etlinger was aware of this materiality at the time of the '095 patent prosecution in 1974.

### B. The Glaser Reference

Nintendo contends that Magnavox concealed the Glaser patent (U.S. Patent No. 3,151,248) from the PTO even though it knew the patent to be material to the light gun claims of the '095 patent. The record does not support this charge. During the prosecution of SN '798, the parent application to SN '691, a patent examiner rejected the light gun claim based, in part, on the Glaser reference. When the applicants in 1970 filed the divisional application that became SN '691, it included some of the light gun claims. Nintendo argues that the applicants' failure to cite Glaser to the new patent examiner who was considering SN '691 constituted inequitable conduct.

■ There is no doubt that it is good practice for a patent applicant with a divisional application to inform the new patent examiner of all prior art that was before the first patent examiner. However, the PTO rules require a patent examiner to search the parent application file for prior art himself. *See* MPEP § 707.05 ("In all continuing applications, the parent applications should be reviewed for pertinent prior art.").

■ If the Examiner had properly performed his job, he would have had the Glaser reference before him as a result of its inclusion in the parent SN '798 application. In other words, if the '095 patent issued without the Examiner ever having considered the Glaser patent, the Examiner is to blame rather than the applicants. Although the applicants could have and perhaps should have disclosed the Glaser reference separately, we do not find that their failure to do so is evidence of an intentional act of deception.

When Magnavox filed an application (SN '542) for reissue of the '095 patent in 1977, they incorporated by reference a Letter of Information filed in the co-pending '480 patent reissue application (SN '538). Stipulated Facts at ¶ 77. Included in that Letter of Information was a Notice of Prior Art that had been filed by defendants in the litigation involving the '284 and '285 patents. Because the Glaser patent was disclosed in that doc-

ument, we find that the applicants did not withhold material information from the PTO during the prosecution of the SN '542 application.

### C. Rejection of the German Patent

■ Nintendo contends that the applicants concealed the fact that in 1985, while the SN '542 application was still pending, the German Patent Office rejected a corresponding patent application based, in part, on the Glaser patent. Although the applicants, in a departure from Sanders' normal practice, did not inform the PTO of the rejection, we find that this did not amount to inequitable conduct.

In the first place, notice of the German Patent Office's rejection would not have been material to the SN '542 application because the rejection itself would have added little to the information already before the Examiner. As noted above, the Examiner should have already considered the Glaser reference during the reissue process. In addition, it would have been immaterial for the Examiner to have been informed of the German rejection because the German Patent Office acts pursuant to German patent law and not United States patent law.

Furthermore, there is no indication that Sanders' failure to inform the PTO was based on an intent to deceive nor was it under any affirmative obligation to disclose that information to the PTO.

### III. Other Claims

Nintendo has made other claims about Magnavox's conduct with respect to its '598 patent and '045 patent in an attempt to show a pattern of misconduct. We reject those contentions as not relevant to our inquiry. *See FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d at 524 (a patent applicant's " 'practice' with other applications is not relevant").

### CONCLUSION

The Court finds that Nintendo has failed to meet its burden of proving by clear and convincing evidence inequitable conduct during the prosecution of the '507 and '305

patents. In reaching this conclusion we have considered each of Nintendo's claims separately and also considered the totality of the applicants' conduct before the PTO. Because there was no inequitable conduct, the issue which gave rise to Nintendo's motion to disqualify Neuman, Williams, Anderson & Olson from acting as defendants' trial counsel (i.e. whether members of that firm would be witnesses at the trial) has become moot and that motion is hereby denied.

So ordered.

### APPENDIX 1

### STIPULATION OF FACTS

1. This is a declaratory judgment action brought by plaintiff Nintendo of America Inc. ("Nintendo"), requesting, *inter alia*, a declaration of invalidity and non-infringement of U.S. Patent No. Re 28,507 ("the '507 patent"), entitled Television Gaming Apparatus, and U.S. Patent No. Re 32,305 ("the '305 patent"), entitled Method of Employing a Television Receiver for Active Participation. The '507 patent and the '305 patent are owned by defendant Sanders Associates, Inc. ("Sanders"), with an exclusive license with a right to sublicense granted to defendant The Magnavox Company ("Magnavox"). The present proceeding is only concerned with issues of inequitable conduct with respect to these patents.

2. Nintendo of America Inc. ("Nintendo") is a corporation organized and existing under the laws of the State of Washington, with its principal place of business in Redmond, Washington. Nintendo presently imports, assembles and sells in the United States coin-operated video games and home video games.

3. Defendant, The Magnavox Company ("Magnavox"), is a corporation organized and existing under the laws of the State of Delaware. Magnavox is a wholly-owned subsidiary of North American Phillips Corporation.

4. Defendant, Sanders Associates, Inc. ("Sanders"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in South Nashua, New Hampshire. Sanders is generally engaged in the design and manufacture of commercial and military electronic equipment.

5. Sanders was the owner of United States Patent No. 3,659,284 ("'284 patent"), entitled "Television Gaming Apparatus." The original application for the patent was filed on May 27, 1969, and the patent issued to Sanders, as assignee of William T. Rusch, on April 25, 1972. An application to reissue this patent was filed on April 25, 1974, and the patent reissued as United States Patent No. Re. 28,507 ("'507 patent") on August 5, 1975. Sanders is the owner of the '507 patent. It will expire on April 25, 1989.

6. Sanders was the owner of United States Patent No. 3,659,285 ("'285 patent"), entitled "Television Gaming Apparatus and Method." The original application for the patent was filed on August 21, 1969, and the patent issued to Sanders, as assignee of Ralph Baer, William T. Rusch and William L. Harrison, on April 25, 1972. An application to reissue this patent was filed on April 25, 1974, and the patent reissued as United States Patent No. Re. 28,598 ("'598 patent") on October 28, 1975. Sanders is the owner of the '598 patent.

7. The '305 patent is a reissue patent. It was originally issued on August 13, 1974 as United States Patent No. 3,829,095, entitled "Method of Employing a Television Receiver for Active Participation." It issued to Sanders as assignee of the named inventor Ralph Baer from Application Serial No. 62,691 filed on August 10, 1970. The application for reissue, Serial No. 810,452, was filed on June 27, 1977. The '305 patent was reissued on December 16, 1986. It will expire on August 13, 1991.

8. Magnavox is the exclusive licensee of the patents referred to in paragraphs 5 through 7.

9. Sanders is the owner of United States Patent No. 4,395,045 ("'045 patent"), entitled "Television Precision Target Shooting Apparatus and Method." The application for the patent was filed on June

16, 1980, and the patent issued to Sanders, as assignee of Ralph H. Baer, on July 26, 1983. On August 27, 1986, Sanders gave Magnavox a non-exclusive license for the '045 patent. On September 2, 1987, following Nintendo's discovery of "QWAK" and "OUTLAW," two prior art video games manufactured by Atari, defendants publicly disclaimed all claims of the '045 patent which had been asserted against Nintendo.

10. James T. Williams and Theodore W. Anderson were, as of 1974, and are members of the law firm of Neuman, Williams, Anderson & Olson of Chicago, Illinois ("Neuman, Williams"). Neuman, Williams represented Sanders in the prosecution of the reissue applications that led to the '507 and '598 patents. Neuman, Williams has also represented Magnavox and Sanders in all litigations involving these patents.

11. Thomas A. Briody was Corporate Patent Counsel at Magnavox and has since held that position with successor companies. His responsibilities include patent procurement and utilization or licensing on behalf of The Magnavox Company and its successors in interest.

12. Louis Etlinger, then the Director of Sanders' Patent and Licensing Department, and Richard I. Seligman, then an assistant patent counsel at Sanders, were the principal in-house attorneys at Sanders involved in the preparation, filing, and issuance of the '480, '507, '598, '045, '305 and '095 patents.

13. Ralph H. Baer is the named inventor of the '480 and its reissue the '282 patent; the '095 and its reissue the '305 patent; and the '045 patent. William T. Rusch is the named inventor of the '284 and its reissue the '507 patent. Baer, Rusch and William L. Harrison are the named inventors of the '285 and its reissue the '598 patent. Baer, Rusch and Harrison were employees of Sanders at all times relevant to this litigation. Baer and Rusch are currently Sanders employees.

14. In 1961 and 1962, a computer game known as Space War was developed at the Massachusetts Institute of Technology. Space War was originally designed by a small group of computer programmers known as "the hackers" to be played on the PDP-1 (Programmed Data Processor-1) computer manufactured by Digital Equipment Co. of Maynard, Massachusetts.

15. Many versions of the game Spacewar have been developed incorporating various features into the game. Parameters that have been varied include the torpedo speed, lifetime, and launch rate; the presence or absence of a "killer sun" which exerts a strong gravitational influence on the ships; and the movement of the spaceships at the edge of the display area.

16. The 1960's Spacewar game involved at least two players and a computer with an X-Y point-plotting display. Each player was provided with a set for four switches to control the movement of his or her spaceship shown on the display, and to fire torpedoes from his or her spaceship at an opponent's spaceship. The object of the game was to destroy the opponent's ship by shooting torpedoes.

17. One of the "hackers," Steven Russell, left MIT in early 1963 and went to work at the Artificial Intelligence Project at Stanford University headed by Professor John McCarthy. Russell brought the Space War game to Stanford and played it on the PDP-1 computer located in Stanford's Computation Center. A May 16, 1963 article in the Stanford Daily entitled "Computer Wages War" purportedly described the Space War game as played at Stanford and noted that Russell, who created the game, was giving a special course in programming the PDP-1 computer.

18. In the version of the game played on the PDP-1 at MIT and Stanford, a spaceship approaching the edge of the display area would disappear off the edge and reappear at a corresponding point on the opposite edge of the screen and continue in the same direction.

19. During the spring or summer of 1963, John Sauter, then a senior in high school who was to attend Stanford that fall, took a tour of the Stanford campus for incoming freshmen and saw a demonstration of the Space War game on the PDP-1

computer given by Steven Russell at the Computation Center. The Space War game observed by Sauter was essentially the same version which Sauter later played while attending and later working at Stanford from 1963 to 1969.

20. Mr. Williams now believes that the game he saw at Stanford University during the period April to June of 1963 was most likely some version of the Space War game.

21. On April 12, 1974, a declaratory judgment suit was filed in federal court in New York by a video game manufacturer, Midway Mfg. Co., seeking a declaration that several Sanders patents, including the '284, '285 and '480 patents, were invalid and not infringed. On April 15, 1974, Neuman, Williams, on behalf of defendants, filed the first of what would be several lawsuits against various manufacturers and distributors of arcade games alleging infringement of their '284 and '285 patents. *Magnavox Co. v. Chicago Dynamics Industries, et al.,* 74 Civ. 1030 (N.D.Ill.).

22. Defendants and their attorneys were aware that the statutory time in which they had to file a reissue application to broaden the claims of the '284 and '285 patents would expire on April 25, 1974.

23. On April 25, 1974, the reissue applications of the '284 and '285 patents were filed with the Patent Office with certain changes made after the April 23, 1974 meeting with Examiner Trafton. The reissue applications referred to the application for the '480 patent by its parent application and continuation application serial numbers. No reference was made to the '480 patent number or to the fact that the '480 patent had been issued over a year earlier.

24. On August 13, 1974, the '095 patent was issued without Space War ever having been brought to the attention of the Patent Office.

25. On August 15, 1974, Examiner Trafton prepared an office action mailed August 21, 1974 in the '284 reissue application finding that the "application appears to be in a condition for allowance except for formal matters."

On August 21, 1974, PTO Examiner Trafton mailed an Office Action finding all sixty-four claims of the application allowable. The Examiner cited the patents to Althouse, Evans, Ragen, Moffitt and Kiesling.

26. Also on August 15, 1974, Examiner Trafton prepared an office action mailed August 29, 1974 in the '285 reissue application which allowed certain claims and rejected certain other claims as indefinite. Williams conceded that these rejections were meritorious, and the claims were subsequently amended.

27. On September 16, 1974, Chicago Dynamic Industries, a party of one of the then-pending civil actions, filed an interrogatory response, listing certain prior art on which it intended to rely to invalidate Sanders' patents. No Spacewar game was included in those citations.

28. On September 20, 1974, Mr. Etlinger signed an associate power of attorney authorizing Messrs. Williams and Anderson to conduct an interview with Examiner Trafton concerning the '284 and '285 reissue applications. The principal purpose of this interview was to disclose certain of the prior art raised by Chicago Dynamics Industries in their September 16, 1974 interrogatory responses.

29. On September 25, 1974, Williams met with Examiner Trafton and disclosed certain of the prior art references listed by Chicago Dynamics, including the Hermann and French patents.

30. In a paper dated October 22, 1974, defendants formally submitted to the Patent Office the prior art which Williams had cited to Examiner Trafton at the September 25, 1974 interview. Defendants distinguished the prior art references which they had selected for submission to the Examiner from the reissue applications, but did not disclose the game Williams had seen at Stanford in the period April to June of 1963.

31. The Hermann U.S. Patent No. 3,046,676 was before the PTO Examiner of the '507 patent. The Hermann patent discloses a simulated missile and a simulated target tank on a non-television, non-raster scan CRT display. The object of the mili-

tary simulator is to obtain vertical coincidence of the missile with the target tank. Upon achieving vertical coincidence, the screen brightens. No motion is imparted to the tank target upon coincidence.

32. On January 13, 1975, the Examiner mailed an Office Action allowing most of the claims and objecting to and rejecting the remainder. The rejected claims were rejected over the Althouse reference in view of the French patent.

33. Later during the '284 patent application proceedings, the examiner again relied upon Althouse to reject numerous claims. The examiner claimed that "[i]t would be obvious to multiply the number of video control sources for the Althouse display to produce any number of spots. A 'score' on spot position coincidence would be readily apparant [sic]."

34. In an Amendment "A" dated February 13, 1975 to the reissue application of the '284 patent, the continuation application serial number of the '480 patent application was added to the reissue application specification and the prior abandoned serial number was deleted to conform the reissue application to the original '284 patent. No mention or inclusion of the '480 patent number was made or that the '480 patent had in fact issued.

35. On April 24, 1975, the Patent Office issued a Notice of Allowance, indicating that the reissue of the '284 patent was allowed. Such a notice signified that the patent would reissue shortly, after some administrative formalities.

36. During prosecution of the '507 reissue application and the original '284 patent application the PTO Examiner cited (as shown on the face of the '507 patent) eleven patents; Goldsmith et al.; Doba et al.; Althouse; Evans et al.; Hermann et al.; Glaser et al.; Ragen et al.; Gridgett; Moffitt; Kiesling; and French patent No. 1,180.470.

37. During the '507 reissue proceedings, the examiner at one point relied upon the French patent in view of Althouse to reject several claims under 35 U.S.C. § 103. The examiner relied upon the marker generators shown by the French patent in conjunction with Althouse to provide plural markers which could be manipulated on the raster scan display screen. These markers could be manually repositioned and controlled by a user. The claims were ultimately allowed.

38. On or around July 15, 1975, the depositions of Atari, Key Games, Ramtek and Nutting Associates were taken in California by the defendants in the first group of actions brought by Magnavox and Sanders.

39. On or around July 15, 1975, depositions were taken in Palo Alto, California in connection with the first group of litigations brought by Magnavox and Sanders. Williams, Anderson and Briody represented Sanders and Magnavox at the depositions. During the depositions, Briody was advised by Philip Shaw, an attorney for one of the deponents, about the book *II Cybernetic Frontiers* by Stewart Brand which contained sections on the Space War game. During a lunch break in the depositions, Williams, Anderson and Briody drove to a bookstore in Menlo Park, California and purchased a copy of *II Cybernetic Frontiers*.

40. Immediately after purchasing the book *II Cybernetic Frontiers*, Williams, Anderson and Briody had lunch together and reviewed portions of the book and discussed what if any action should be taken with respect to its content. The book, which bears a copyright date of February, 1974, contained, among other things, the following reference to Space War:

> Rudimentary Spacewar consists of two humans, two sets of control buttons or joysticks, one TV-like display and one computer. Two spaceships are displayed in motion on the screen, controllable for thrust, yaw, pitch and the firing of torpedos. Whenever a spaceship and torpedo meet, they disappear in an attractive explosion. That's the original version invented in 1962 at MIT by Steve Russell.

(Page 40).

41. On or about July 23, 1975, another defendant in the Litigation commenced by Sanders and Magnavox, Midway Mfg. Co.

("Midway"), responded to interrogatories, stating that it intended to rely on Space War and other references to invalidate the '284 and '285 patents. These interrogatory responses were not disclosed to the Patent Office for consideration in connection with the reissue applications for these patents.

42. On or about August 1, 1975, Williams inspected documents produced by defendant Midway discussing Space War, which at least included all or a portion of *II Cybernetic Frontiers*, as well as Brand, "*Space War*—Fanatic Life and Symbolic Death Among the Computer Bums", *Rolling Stone* (December 7, 1972) and an undated brochure of Digital Equipment Corporation describing Space War as played on the PDP–1 computer.

43. In the last week of July 1975, Anderson visited the Patent Office issue branch in Washington D.C. to inquire as to when the '285 reissue application would issue as a patent. He learned that a notice of allowance would be mailed in a matter of days and that the patent would likely issue on either October 28, 1975 or November 4, 1975.

44. On August 5, 1975, the '284 patent was reissued as the '507 patent without Space War ever having been brought to the attention of the Patent Office by the defendants or their attorneys.

45. On August 5, 1975, the Patent Office also issued a Notice of Allowance, indicating that the reissue of the '285 patent was allowed, and signifying that the patent would reissue shortly, after some administrative formalities.

46. On or about September 11, 1975, Etlinger was advised by one of Sanders' staff attorneys, Joe Funk, that there was a game Funk had seen at Sanders which Etlinger should see. Etlinger and Seligman, together with others, went to observe the game in the office of John Sauter who had left Stanford University in 1969 to join Sanders. The game was Space War. Etlinger reported to Mr. Williams on or about September 11, 1975 that they had seen the Space War game at Sanders. The game was a version of Space War played on a PDP computer other than a PDP–1.

47. On October 9, 1975, Messrs. Etlinger, Seligman, Williams and Sauter held a telephone conference. Mr. Williams questioned Mr. Sauter concerning his knowledge of Space War at Stanford and Sanders. Mr. Williams did not tell Mr. Sauter that he had also been a student at Stanford and had seen Space War or a game similar to Space War played on a PDP–1 computer at Stanford in 1963. A few days later, Mr. Sauter gave his copy of the 3.1 Space War tape which he had brought from Stanford to Mr. Etlinger.

48. On October 28, 1975, the '285 patent was reissued as the '598 patent without Space War ever having been brought to the attention of the Patent Office by the defendants or their attorneys.

49. On May 1, 1976, Magnavox and Sanders settled with these defendants who had conducted extensive discovery concerning the failure to disclose Space War to the Patent Office in connection with the '284 and '285 reissue applications. Other defendants who were aware of the discovery, and attended the Williams deposition, remained in the case through the trial and judgment.

50. On January 10, 1977, the district court in the *Chicago Dynamics* litigation declared the '598 patent invalid "by reason of anticipation by '507 or, in the alternative, by reason of obviousness in the light of '507." The '507 patent was held not to be invalid over various computer games including Space War.

51. On June 27, 1977, defendants filed applications for reissue of the '480 and '095 patents.

52. On October 22, 1977, defendants filed prior art with the Patent Office in connection with the reissue applications for the '480 and '095 patents. This prior art included a 1962 article written for DECUS by J.M. Graetz entitled "SPACE WAR! Real–Time Capability of the PDP–1" published in *DECUS Proceedings 1962*. The prior art also included a 1963 article published in *Galaxy* magazine, and excerpts

from the depositions of persons knowledgeable about Space War.

53. In conjunction with the citation of the Spiegel reference to the PTO with the reissue application of the Baer '480 patent, other prior art cited by the various defendants was made available to the PTO. The almost two inches of Spacewar materials then available included deposition transcripts from persons involved in the creation of Spacewar, a 1963 article, a 1962 article, the 1972 *Rolling Stone* article and 1974 *II Cybernetic Frontiers,* which were all made available to the PTO.

54. In the 1974–1975 time period, Ralph H. Baer, the Sanders employee who is the named inventor of the '045 patent as well as the '480 and '598 patents, attended trade shows to look for video games which might infringe the Sanders game patents. Baer made a point of visiting the Atari booth at these trade shows, since he considered Atari the leader in the video game business.

55. At the 1974 Music Operators Association ("MOA") show in Chicago, Illinois, Baer observed a new game being introduced by Atari called "QWAK." The QWAK game involves a player shooting at dark duck targets on the screen of a monitor with a photosensitive light gun. The game circuitry then causes a white square or "shotgun blast" to appear on the screen at the point of aim, thus permitting the detection of misses as well as hits.

56. Baer took notes of his observations of the QWAK game. In these notes Baer said he observed:

Dark duck images on gray background flap wings, change size as they disappear into the distance. Rifle is tethered by a heavy (romex-covered) multiple conductor cable. Photocell (photo Q) detects "black" target, hits are registered by having bird fold wings and crash down— dog "retrieves" (dog and bird wipe out upon contact.)

When trigger is pulled and *no* hit is made, Photo Q senses raster position it is imaging and a flashing spot ("exploding shell") is flashed on screen (white spot flashes "hit" position).

57. While observing QWAK at the MOA show, Baer also made several drawings "representing the screen graphics" of the game in operation.

58. Following the MOA show, Baer prepared a report, which he sent along with a copy of his notes and drawings to Etlinger and the Sanders Corporate Director of Research and Development. In the report, Baer stated that QWAK was a "distinctively new design." Baer also claimed in the report that QWAK "[d]irectly infringes" the '095 light gun patent.

59. Baer was aware that his report would be used for possible litigation. Baer passed information from his visits to trade shows on to Etlinger, Seligman, Briody, Williams and Anderson for legal analysis of whether Sanders and Magnavox could assert rights.

60. After the Bushnell deposition, the *Atari* litigation settled in 1976.

61. On July 26, 1983, the '045 patent was issued without QWAK ever having been brought to the attention of the Patent Office by the defendants or their attorneys. No commercial products have ever been manufactured by defendants using the teachings of the '045 patent, other than initial engineering models. Further, no one other than Magnavox has ever been licensed to use the '045 patent.

62. This lawsuit was commenced by Nintendo on February 24, 1986. On March 7, 1986, defendants counterclaimed for infringement of the '507 patent. Defendants' original counterclaim did not include a cause of action for infringement of the '045 patent.

63. On August 27, 1986, Sanders gave Magnavox a nonexclusive license for the '045 patent. Seligman testified that this license was given so that Magnavox could use the patent "in any TV game lawsuit."

64. On August 29, 1986, defendants moved to amend their counterclaim to assert allegations of infringement of the "light gun" or "target shooting" claims of the '045 patent and the '095 patent. Defendants alleged that Nintendo's home video

game system, the Nintendo Entertainment System, infringed these patents when used with game cartridges which operate in conjunction with a photosensitive light gun known as the "Zapper." Defendants' filing was the first notice Nintendo had of defendants' allegations of infringement of the '045 patent. On September 11, 1986, defendants' motion to amend was granted.

65. On August 27, 1987, Nintendo noticed the continuation of Baer's deposition.

66. On September 2, 1987, defendants publicly disclaimed all claims of the '045 patent which had been asserted against Nintendo. On September 3, 1987, defendants submitted a motion to file a third amended counterclaim which dropped the allegations of infringement of the '045 patent. In the memorandum of law accompanying this motion, defendants stated:

> Through the Spring and early Summer of 1987, both parties conducted discovery as to the '095 and '045 patents. As a result of information learned during that discovery, the probability of success at trial on the allegations of infringement of the '045 patent does not now appear to merit the cost to both parties and to the Court of continuing litigation on this patent.... Accordingly, defendants now seek leave of the Court to file their Third Amended Counterclaim to withdraw all charges of infringement of the '045 patent.

The memorandum also noted that the asserted claims had been disclaimed and a copy of the disclaimer was attached.

67. On January 15, 1968, Sanders filed application number 697,798 ('798 application"). This application, which was abandoned on March 18, 1971, is the parent application of the '480 and its reissue the '282 patent, and the '095 patent and its reissue the '305 patent.

68. In an office action dated May 26, 1970, the Patent Examiners finally rejected the light gun claim of the '798 application based on the Hermann patent and a patent to Glaser (U.S. Patent No. 3,151,248). The Examiners stated that Glaser:

> [T]eaches a photosensitive light gun for "shooting" at [a] spot of light displayed on a cathode ray tube (see column 1, lines 12–28). It would be obvious to one skilled in the art to use the teachings of Glaser et. al. in combination with the light spot generating means [of Hermann].

69. The Glaser patent discloses a photosensitive light gun which allows the operator to aim accurately at lighted areas on a non-raster scan cathode ray tube. When the trigger is pulled, a circle of light is projected from the light gun in the direction the gun is aimed. A photosensitive device in the gun then senses a light spot on the screen of the CRT within the circle of light and generates an electrical signal which could be used to operate other electrical apparatus. The Glaser light gun is designed so that "the diameter of the circle [of light] is constant, regardless of the distance of the light gun from the screen." Glaser at col. 4, lines 22–25.

70. On August 11, 1970, the light gun claim of the '798 application was allowed following an interview by Baer and attorneys from Sanders with the Patent Examiners and an amendment to the claim upon which the light gun claim depends.

71. The Notice of Allowance for the '798 application was mailed on November 6, 1970. Etlinger paid the base issue fee on November 12, 1970.

72. On March 11, 1971, Seligman filed a petition to withdraw the '798 application from issue:

> [F]or the purpose of filing a continuation application in view of a newly discovered reference, French Patent No. 1,180,-470 published June 4, 1959.
>
> In prosecuting an application in Sweden corresponding to subject application, French Patent No. 1, 180, 470 was cited as a reference by the Swedish Patent Office. A translation of said French Patent was ordered and received, and after subsequent review of same with Applicant, it was ascertained that the claims of subject application must be amended.
>
> Applicant recognizes his duty to the Patent Office of a frank and truthful disclosure. Accordingly, if this petition

will be granted, Applicant will file a continuation application and cite as prior art said French Patent.

This petition was granted, and the '798 application was withdrawn from issue on November 3, 1971. On March 22, 1971 defendants duly filed a continuation application which cited the French patent and continued the examination before the same examiner.

73. On August 10, 1970, Sanders had also filed a divisional application of the '798 application which came before a different examining group within the Patent office. This divisional application, serial number 62,691, eventually issued as the '095 patent.

74. On October 30, 1973, in an office action, the Examiner rejected the light gun claims of the divisional application as obvious in view of a patent to Foisy when combined with Hermann. The Foisy patent described an apparatus in which a flashlight mounted on a turntable causes a spot of light to flash across a non-CRT screen made of a material capable of reflecting a beam of light. A person aims a gun equipped with a photosensitive cell at the spot of light as it moves across the screen. If the gun is properly aimed at the spot of light when the trigger is pulled, the photocell senses the light and generates a signal which causes the turntable to stop.

75. The Examiner stated that the Hermann patent (which described generation and manipulation of missile and target dots on the screen of a cathode ray tube) showed all the elements of the light gun claim "except a photoelectric sensing means." The Examiner then described the importance of Foisy:

> Foisy shows it is old to employ such a sensing device to indicate a successful "hit". It would be obvious to one ordinarily skilled in the art to use a rifle such as Foisy's, complete with the sensing attachment, to shoot at the target displayed on the screen of Hermann.

76. On June 27, 1977, defendants applied for reissue of the '095 and '480 patents. Defendants' basis for seeking reissue was the discovery of a patent to Spiegel which described generating a target

and missile dot on the screen of a raster scanned television receiver for simulated training. Defendants contended that the '095 and '480 patents, which specified that they could be used for simulated training or games, were now too broad in view of Spiegel.

77. On October 18, 1977, defendants filed a Letter of Information in the '480 reissue application which disclosed prior art. The prior art contained in this disclosure was incorporated by reference in the '095 reissue application by defendants.

78. On May 17, 1985, the German Patent Office denied light gun claims of the corresponding German application based on the Spiegel and Glaser patents.

79. Defendants did not disclose the rejection by the German Patent Office to the Patent Examiner considering the '305 reissue application.

80. On May 27, 1986, in an amendment, defendants cited a new item of prior art, the Drumheller pool game displayed at a computer conference in San Francisco in 1966. This game allowed a player to hit a cue ball character which appeared on a cathode ray tube screen by moving a photosensitive light pen across the cue ball character. Defendants stated that Drumheller "is no more relevant than the prior art already of record. It is merely an application of a light gun or pen such as is shown in the Brigett or Glaser references of record to provide an input identifying a selected character or location on the face of a cathode ray tube display. Light guns or pens of this nature were, of course, well known in the prior art."

81. In the Reasons for Allowance dated September 5, 1986, the Examiner stated that "[v]ector display light pens were well known prior to Applicant's invention, but they are entirely different from the raster display of a home T.V. set."

82. On December 16, 1986, the '095 patent was reissued as the '305 patent, without the German Patent Office rejections based on Spiegel and Glaser ever having

been brought to the attention of the Patent Office by the defendants or their attorneys.